Mr. McFedrin, are you ready to go? I am ready to go. Okay. Maybe you can help, or any of your parents, they're going to have a question for you. Charlie McFedrin for Petitioner Sierra Club. Thanks. My question is the five power plants that you selected that your friends on the other side take some issue with in terms of how representative they are and the time period during which your members were compiled, how were those five plants selected? Well, it's our understanding that there are approximately six plants to which this rule applies. These are very large coal-fired power plants that employ selective catalytic reduction. And I thought you had entered data with regard to five to show why the negotiations that have been imposed here are not realistic. I'm sorry, Your Honor, we were talking over each other. Could you repeat that? I thought you had entered data, particularly from the Air Markets Program, showing that five of the Pennsylvania power plants that you selected had margins that were greater than .12 nexus oxide per unit. And those five I'm talking about, there's some debate about how representative they are. How did you pick those five? Well, these five are, to my understanding, this rule applies to a very limited number of plants. The largest plants are what we're arguing about here. These are coal-fired power plants of large capacity in Pennsylvania, which are the plants Montour, Cheswick, Keystone, Homer City are in our list. Bruce Mansfield is included in our list, although that plant closed last year, I believe. And Kahnemaw is a sixth plant that has recently, relatively recently, installed advanced controls, selective catalytic reduction. And again, those five were not selected by you, actually, but by EPA, so I may have missed looking at that question. Your Honor, I think I have the right universe. If you look at JA329, there's a chart that the department has offered of plants, including Homer City, Bruce Mansfield, Keystone, Montour, and Cheswick, which are five of the six I just mentioned. And Kahnemaw would be the sixth plant with the more recent pollution controls. That's at JA329. Okay. Shall I proceed, or do you have another question? No, no. Go ahead. Go ahead. Thanks, Your Honor. May it please the Court, Charlie McFedrin for Petitioner Sierra Club. Pennsylvania suffers from a chronic problem with ozone smog pollution. Seventeen counties, the home to 8 million people in our communities, suffer from increased emergency room visits, hospital admissions, asthma attacks, and compromised immune systems because of excess ozone pollution. There are three problems with EPA's approval of the department's rule. First, the emission rate is not supported and is arbitrary. Second, the temperature exclusion, the loophole, is also not supported by evidence in the record. And third, the record-keeping requirement, which hinges on temperature, does not require the reporting of temperature, and therefore is also arbitrary. I'd like to start with the emission rate. The reasonable available control technology standard, in EPA's own terms, requires the adoption of the lowest and toughest emission rates. This is what EPA calls a technology-forcing standard. Wait, but it's not best available control technology. This is reasonable available control technology. That's correct, Your Honor. Okay. It sounded like you just equated that standard with what I understand BACT to require. Well, I almost got to the end of my sentence. I was going to qualify what I was saying by what EPA has said, which is considering technological and economic feasibility. So there is that qualification.  is based on evidence that other sources, in fact, have applied the control technology in question. So if you look at that economic feasibility standard and you think about the plants in Pennsylvania, this rule applies only to plants that already have the gold standard, that already have selective catalytic reduction. So there's no question, we believe, about technological feasibility. The question is this number, this 0.12 rate. This is pounds per million BTU of nitrogen oxides that EPA has adopted. And fundamentally, EPA has not supported this 0.12 number. Okay. Yes, Your Honor. Question. What do you say to the charge that you've cherry-picked your data? Why is it that you think the RAC standard should be the 19th percentile performer, not the 10th percentile or 25th or 30th? What makes that arbitrary and capricious to select that point on the spectrum? Sure. There are a couple reasons. I mean, the first reason is that EPA hasn't supported its decision of 0.12. EPA has identified, and I refer the Court to JA 054, which is EPA's seminal technical support document for this rulemaking. EPA refers to a range of emission levels at JA 055 for this sort of technology, and that range is 0.5 pounds per million BTU to 0.25. So again, the range is 0.5 to 0.25. EPA has landed on 0.12, but they haven't explained why 0.12 is the correct number. Part of the problem is that this number, 0.12, comes in from Pennsylvania DEP, which has looked at historical average emissions for these plants, and that's a chart I mentioned a few minutes ago at JA 329 that lists the plants. And the problem with an average is it just ratifies what's gone before. It picks up the levels of emissions we've seen in the past without requiring advancement. I thought I heard a question coming. No. Okay. So the data that the Court asked about cherry-picking, we have submitted data over a broad range of these plants, four of the five still operating plants, and 150 different months. We've matched the monthly average in the department's rule with monthly average data, and that data shows that these plants can do better. In fact, they've been doing better for many years. And to say that they have to do better to survive the level of deference that we have to afford the decision. As Jim Beamer said before, it's not the best. It's just technically and economically feasible, not the best, most efficient standard. That's correct. There are – I apologize. I'm not sure which judge is asking which question. I'm sorry. Yes, I was going to ask myself. But the fact they can do better doesn't help us. Five minutes. Okay. Maybe I can get into the alphabet soup here a little bit. One of the judges asked before about best available control technology, which is another of the Clean Air Act's technology standards. That's a standard that applies under permitting. Although it uses the word best and this standard uses the word reasonable, they do have a little bit in common because they include a feasibility or cost element. The way EPA has described the feasibility piece here is quite specific in the general preamble that we cite in our brief at page 6. And it applies – it regards whether this technology is widely applied. And it's obvious here that it is. If I could talk for just a moment about temperature and record keeping. Let me take you to that. The core issue that doesn't really get engaged very directly in the briefs is on temperature. I have a question on temperature and you talk about temperature and then we'll talk about record keeping. The closest that the state and the EPA come to justifying this has to do with ammonia slip. Right? So you've got the problem that the catalytic converters don't work so well. There's a fall off in efficiency. You've got to inject ammonia. You get ammonia slip. You get ammonium bisulfate. The sticky liquid's going to gum up the catalytic converters. And your response is, well, if that's a very short-term thing, it'll burn off overnight. But I didn't really see a lot of detail on this one way or the other in the record. What would you say about why ammonia slip is really not that great a justification for a cutoff at 600 degrees? Well, Your Honor, I think you just said it. There's not much in the record about ammonia slip. And in particular, the Department and EPA have not supported 600 degrees, either with a cost evaluation or really anything. EPA didn't even mention it in its proposed rule. And in the final rule, EPA acknowledged that neither EPA nor DEP explained in detail why this temperature loophole should be reasonably available control technology. So I think it's not a loophole. Mr. Judgeman, can you explain the loophole? Why is the 600 degrees a loophole? It's a loophole because above 600 degrees, one level applies. One level of emission control applies. And we have an argument about whether that level of emission control is sufficient. But then below 600 degrees, that level is disregarded, and another much less stringent level, up to three times or more, as much pollution applies below 600 degrees. The harder the reaction, the more efficient the reaction. That's true in any chemical reaction. Two minutes. I'm sorry, could you repeat that, please?  That's true in any chemical reaction. So why would it matter that much what happens below 600 degrees? Yes, Your Honor. There's a chart that both EPA and DEP have used in their briefs. It's on page 41 of DEP's brief. And I think it really goes to the heart of why the temperature loophole is a bad idea. If you look at that chart, you'll see below 600 degrees, there is still NOx reduction taking place. In fact, at 590, 580 degrees, this technology, this selective catalytic reduction, is still achieving 70 or 75% reduction. And remember, these are the biggest, most high-emitting plants in the Commonwealth. These plants are going to contribute to that sector emissions of 25% of our NOx pollution. So if you can achieve a 70 or 75% reduction by the application of selective catalytic reduction below 600 degrees, you should. And I defy EPA, maybe I shouldn't say it that way, but EPA simply has not supported 600 degrees with any cost data, with any information that would allow the court to find that it's not to reduce, I should say, the emission control requirement below 600 degrees. Okay, so what's your response? The closest I took the EPA and Pennsylvania to be responding to this is when they picked the 0.12 standard, they threw out all the plants that were emitting more than 0.30. And they did that on an understanding that there were already a bunch of plants that were emitting more than 0.30, and they stopped the catalytic converters when they were burning at too low a temperature. So it seems like the industry practices, they had to do that because otherwise they were going to be poisoning the catalytic converters. Is that not correct? Is that not in fact the way that this works in the industry, that they just, they have to bypass the catalytic converters at lower temperatures? Well, they have the opportunity to average monthly, and that should give them some flexibility. There's also flexibility in this rule in system-wide averaging and the opportunity for alternative limits. But I think the core page of the record that I would point the court to again is JA329, which is this chart in the record of this rule that shows the average NOx rate. And I say average in particular because it means not the better or best, but simply ratifying the average rate. And then it says presumably when SCR is in operation. So there's mixed messages in the record about whether we're talking about when SCR is operating or not. But this chart, I think that qualifying word really says a lot, because we really ought to only be looking at how well these plants do when they're in operation. So we shouldn't be all the time or almost all the time subject to a qualification you just noted. We really shouldn't be ratifying operations of plants that are not operating SCR for whatever reason and ratifying that higher average limit. Maybe I'm missing something, but looking at the chart, the only difference I see in the daily or 30-day information is at Keystone Unit 2 and at Montour Unit 2. Otherwise, they're all the same. Right. And so I think it's fair to look at the 30-day figure there, because that's the rule that the Department has proposed and EPA has approved. Okay. So your challenge to the 30-day period then seems to fall. But that's not the problem. Your problem is how they're coming up with a 0.12 figure, if they're excluding all of this higher emissions that would bring the – they're both benefiting from 0.12, and they're excluding all of this higher emission that's happening at night. Well, I think what I'd like to focus on for this chart are the two things, the two words I mentioned, average and presumably. If the Department adopted a shorter averaging period, that would make the rule more stringent. But for purposes of this aspect of the argument, I'm willing to focus on the average and presumably aspects of this JA329. If I could say before my time expires, if I could say a word about recordkeeping and then conclude. Please. On recordkeeping, the Clean Air Act requires enforceable emission limitations. That's in Section 7502 cited in our brief and also in EPA's brief. And the problem here is the Department's rule does not require recording or reporting of temperature. Why don't the state requirements do that? Don't the state requirements require them to report to the state all the things required by the plan, and the temperature is one of those things? And so why isn't that sufficient? It's not specific enough. There's no guarantee in the language in Rule, I believe it's 129.100, or the Department in its brief spends four pages trying to gin up other rules that might require reporting. None of those things serve as a basis for this rulemaking, and they shouldn't be considered by the court. But I looked at them again. Even if you do consider them, none of them specifically require temperature. Now, if you are on the Pennsylvania Turnpike and you're driving on the Turnpike, you might be in an area that requires a 70-mile-per-hour speed limit or a 55-per-hour speed limit. If somebody's measuring your speed and trying to figure out whether you're in violation, they won't know unless they also know where you are, and that's exactly the problem here. Even if you know the emission rate, if you don't know the temperature, you don't know which side of this temperature loophole you fall on, if you fall on the more stringent or less stringent side. So without an explicit requirement to report temperature, there's no way for DEP, for EPA, or my clients who look at these issues too, to know whether these plants are in compliance and what their NOx emissions are. Mr. McEdrin, it's Judge Vidas. I'm looking at Rule 129.100. And when I look under D, the owner or operator of an air contamination source subject to this section and subject to 129.96 to 129.99 should keep records to demonstrate compliance. It must include sufficient data and calculations to demonstrate that the requirements are met. Data or information shall be recorded and maintained in a time frame consistent with the averaging period. I mean, maybe we should ask Opposing Counsel, but why is it not sufficient if Opposing Counsel will assure us that the way that this is interpreted and applied includes the temperatures required to police this? Your Honor, I can't bring a citizen suit based on statements of Opposing Counsel or even what's in a brief. I need something that's in a regulation that nails down the temperature, which is an essential, really indispensable aspect of compliance with this rule, is reported to DEP so our clients can get a hold of that data. Can you get this by FOIA, by Pennsylvania FOIA request? Well, how many layers of difficulty do we want to face here? I mean, a FOIA request can be complied with or ignored by the agency. The company can make some claim about the data. The agency has to want to go get the data. Really what we need to know that these big polluters are complying with NOx limits is for the company to keep the records and report them to DEP. Then we can go get them by right to know, whereas we do in the Commonwealth what's called a file review, and that's a fairly easy way to get data. If they're at DEP, we can get it. If there's no temperature in the rule, we are not going to get it. And I would not accept a promise of some later fix or improvement in this rule. DEP's approval of this rule as it stands now is arbitrary because it doesn't require reporting of the most essential data point here next to emission rate. All right. We'll hear from opposing counsel about how that's being applied and look to his response. Thank you, Mr. Chairman. Mr. Adkins. Yes, may it please the Court. My name is Brandon Adkins of the U.S. Department of Justice. I represent the respondent United States Environmental Protection Agency. I'll address the following three issues. EPA conducted a thoughtful analysis. How much time are you taking for your argument? I'll take 13 minutes for my argument, Your Honor, and reserve two minutes for Pennsylvania Department of Environmental Protection. Okay, but choose one of these two. Go ahead, Mr. Adkins. Thank you. First, EPA conducted a thoughtful analysis of Pennsylvania's NOx limit for coal-fired boilers, and EPA's decision falls within an area of the Clean Air Act where Congress left to EPA's expertise discretion to determine what controls are reasonably available. This area contrasts starkly with cases on which Sierra Club relied, where Congress required EPA to adopt maximum achievable control technology based on data from best-performing sources. That's not the standard at issue here, and EPA reasonably exercised its discretion. Second, Pennsylvania explained why market changes required adoption of the inlet temperature threshold. EPA reviewed Pennsylvania's control approach and determined that it was not consistent with technical limitations and costs of FCR. Third, Pennsylvania's NOx limit is an enforceable emissions limitation, the specific record-keeping requirement that Sierra Club seeks is unnecessary. With respect to my first point- Well, let's bring that up. Why is it necessary? How can they know or anyone know whether or not you're complying with the necessary parameters, absent record-keeping, to know at what time a certain temperature was achieved or emission was achieved? Thank you. The simple answer here is that because the rule requires operators to maintain data and calculations to demonstrate compliance, it would be impossible for an operator to demonstrate compliance with this particular limit without having that inlet temperature data. You heard from my opponent that this was an essential aspect of the rule. We agree. In fact, it would be impossible for an operator to prove compliance without this data. Pennsylvania's intervener brief further demonstrates this interpretation, and Pennsylvania is the state agency that is responsible for enforcement of this rule. Am I missing something? If it's necessary to record the data, what is the problem with reporting it so that folks outside of the industry know whether or not you're complying? Am I missing something? No, Your Honor, I don't think you are. This is a general record-keeping provision that applies to the entirety of Pennsylvania's SIT revision. It's not just with respect to this particular emissions limitation. There's a laundry list of limitations that Pennsylvania enacted, and it required record-keeping using this general provision. Now, when EPA approved Pennsylvania's approach here, it referred to other more specific requirements that Pennsylvania has enacted. And if you look at the state-level rulemaking, particularly at pages JA309 and JA288, you can see that Pennsylvania refers to other additional reporting requirements that are required by virtue of Pennsylvania's permitting process. That's information that's in the record and that the Court can consider here, and Pennsylvania can further explain that and have done so in its brief. Where did the 600 degrees come from? When I had 500, I understand the lower it gets, the more problems it runs into. But why not 750 or 800 or 750 or 735? Well, the 600-degree temperature threshold is not something that EPA is imposing. It's important to take a step back and appreciate the role that EPA is in here. Pennsylvania adopted the 600-degree temperature threshold because changes in the market have shifted operations for these coal-fired electricity-generating units from high-capacity input to variable operations. And Pennsylvania's solution for regulating these sources in light of those facts was to adopt a temperature threshold. When the units are operating in such a way that the inlet temperature is at or exceeds 600 degrees, Pennsylvania requires additional max reductions that are achievable using this particular pollution control. Mr. Atkins, Judge Davis, could I ask you about the interaction of the 0.12 and the 600 degrees here? So the way you came up with the 0.12 was by looking at the existing range of emissions and taking the 19th percentile, but you didn't exactly account for this when these plants are off the catalytic reduction, the SCR, right? You just excluded all the data that were over 0.3, or rather Pennsylvania did, and you ratified that. So it's like the industry gets two benefits. First, they get a 19th percentile, most of the plants pass, and then they have this other much higher limit that was not built into the data on which you based this 0.12 limit in the first place. So even if it's okay to take something at the 19th percentile or something, you've loosened it further by not accounting for the fact that most of these plants are going to emit substantially more because of the exemption overnight every night. So how is the 0.12 limit reasonable given that you're also tacking that further leeway on top of it? Thank you. I actually disagree with that characterization. I think the limit at issue here is an additional NOx reduction. So looking at the entirety of Pennsylvania's control approach for these boilers, there's two tiers for compliance. There's the boiler configuration limit that Pennsylvania adopted and EPA approved as RAC level controls, and that Sierra Club does not challenge here. So even when the boilers are operating below this threshold, they're still complying with RAC, or they need to be complying with RAC level controls. What Pennsylvania said was we're going to require additional reductions because these specific units have SCR already installed on their drawstrings. So because they already have this technology installed, we're going to require that they use this technology when their inlet temperatures are at or exceed 600 degrees. But they can choose whether to operate at 600 degrees or not, and if they don't, then they're subject to some limits that 0.35 or 0.40 in some cases are extremely forgiving. That is true that the limits that would apply outside of this threshold are more forgiving, but there are also RAC level limits that are consistent with the evidence in this record what other states have done, and they're not being challenged here. Okay, well, let's talk about other states. Other states don't have a 600-degree threshold. Do you disagree? Is Pennsylvania the only state that has this threshold? Certainly the surrounding states don't. That's actually correct. I'm not aware of other states that have this threshold, but I'm also not aware of other states that have used the control approach that Pennsylvania has used. No other states require additional reductions for this category of source, and EPA considered that and explained how its decision was supported by a consideration of what other states have done, but that's also not the be-all, end-all of whether Pennsylvania's regulation lives or dies. Five minutes. The Bureau would like to compare this limit just to New York, but that really wouldn't be a fair thing to do based on this record. It's true that other – sorry, I thought I heard a question. Yeah, Kevin, if you read about Maryland, but they're also comparing it to Maryland, and then I think Connecticut too, aren't they? Well, what EPA did was it looked at what other OTR states have done when it was considering the boiler-type limitations, but EPA noted that Pennsylvania's rule was unique, and then it required additional reductions for these sources. But even setting aside the .12 limit, if you only look at the boiler-type configuration limits, Pennsylvania's isn't the most stringent, and it's not the least stringent. It falls within these other OTR states' ranges. Then Pennsylvania required additional reductions using the .12 limit. Mr. Atkins, let's talk about the point that Mr. McFedrin made, which was if you look at this curve, catalytic converters can achieve – catalytic reduction, SCR, can achieve substantial benefit at 500 degrees, at 550. All you said was, hey, there's this optimal range, but optimal doesn't mean that it can't be done at slightly lower efficiency rates. So what I want to hear about is what about these references in the record to ammonia slip and having to eject ammonia, you know, ammonium bisulfate, and is that sticky, and would that burn off overnight? There's a little bit in the record, but there's not very much that's specific about why you can't just require the limits that would be achievable by using catalytic converters all the time or using catalytic converters over – at different places, your own evidence said 315 degrees or 480. Why push it all the way up to 600 instead of saying 480 or 500? Thank you. That's actually an important piece of clarification that, in hearing the discussion with my opponent, I want to clarify. EPA's approval of the inlet temperature threshold was based on its engineering judgment that additional NOx reductions are not achievable at lower inlet temperatures. Sierra Club made a point over ammonium bisulfate accumulation. It's pointed to data from the Cheswick facility saying that it was able to operate at lower temperatures without operational issues, but that wasn't the basis for EPA's determination here. EPA determined that it is chemically not possible to achieve a greater NOx emissions rate year-round at lower inlet temperatures. Okay, but I did not see it in the record. Could you direct me to a place in the record and then talk us through it? Yes, absolutely. So if you look at the final rule, this is of the Federal Register, pages 2278 through 2279. Okay. And that's JA011 through JA012. First, EPA determined what an efficient temperature range is. And it's important to distinguish this between an operating range. It's true that SDR can operate at a wider range than what's an efficient range. And the reason for that is because NOx reduction efficiency, which is a measure of how much pollution can be reduced from the exhaust stream, is largely dictated by the temperature in the catalyst chamber. That's because the chemical reaction that reduces nitrogen oxide to nitrogen in water vapor occurs within a particular temperature range. And that range can vary based on the type of catalyst being used, the age of the system, and other factors. But in EPA's review of the technical evidence, it found that there's an efficient range that is much shorter than the operational range. One minute. Okay. I see this at the top of JA012 in the first column, but the justification is the reductions achieved would be only slightly better than those achieved with low NOx burners. So that argues for a slight or modest reduction from 0.12, but it doesn't explain why the limits are three times as lax. What do you say in response to that? Well, Pennsylvania determined that lower NOx reductions were not capable of being achieved using SCR at lower inlet temperatures. If you look at the technical documentation, when the system is operating within its efficient temperature range, the NOx reductions will result in a greater reduction than 0.12. 0.12 is taking into consideration that Pennsylvania's threshold is 600 degrees. It's actually well below what the evidence shows is an efficient range for the majority of commercial catalysts, which is 700 to 750 degrees. So that's the interplay between the 0.12 in the inlet temperature and how that relates to NOx removal efficiency. Can you point me to where in JA11012 you say Pennsylvania found it is not possible? I'm not finding such a strong finding. Sure. With the court's indulgence, just one moment, please. Okay, so if I could take you to the technical support document number one, which is at JA058. 058. Yeah. You'll find this in the middle paragraph, the first full paragraph of the page. At the end. Okay, EPA agrees, operations of existing SCRs and CRs should be both technically and economically reasonable, even when this may include additional costs for optimizing existing systems, such as additional reagents or catalysts. If you'll pardon me, Your Honor, I pointed you to the wrong page. It's JA054, my apologies. All right, so the first full paragraph there towards the end. This is actually in the third paragraph, last sentence, in our engineering judgment. So what's the logic here? In our engineering judgment, based upon acknowledged limitations of SCR or selective non-catalytic reduction, that's FNCR, EPA agrees with PADEP's determination that SCR or FNCR cannot result in lower NOx emissions rates at these lower operating temperatures. I'm sorry, what are you reading from that page? This is the last sentence of the third paragraph on page JA054. All right, I see the conclusion, but can you explain the logic that leads up to that conclusion? It says the protocol approach is practical and acceptable, but what is it that makes anything tighter cannot result in lower NOx emissions? Sure, so EPA looked at a few different things. It looked at the technical limitations of SCR, which is reflected in the engineering documents that are in the record. It looked at what Pennsylvania already requires of these units, so the combustion controls. That basically modifies how coal is combusted in a way to reduce NOx emissions before they even enter into the exhaust stream. And EPA looked at what was achievable at or below the 600 inlet temperature rate. For a majority of commercial catalysts, based on the technical documentation, it considered what Pennsylvania already requires in terms of NOx reduction through combustion controls. And it considered that when operating below optimal temperatures, additional catalyst is used, which can increase maintenance costs. Taking all those things into consideration, EPA rendered a technical judgment here that required that SCR was not capable of lowering NOx emissions while operating below the same inlet temperature. Are you reading from something else, or is there something else that would point us to these kind of economic and technical limits on using additional catalysts? Any other record citations you'd like to give us? Sure, I think the best one to give you would be a JA102, which is going back to the final rule. And this is where EPA, at the end of the paragraph that carries over onto JA012, notes noted efficiencies with SCR economic considerations from using additional catalysts to achieve diminishing NOx removal. JA102. Oh, 012. Okay, got it. So if I may just – I see my time is running low. I just want to point out one thing with respect to the 0.12 limit and Sierra Club's data. EPA explained why Sierra Club's data was not sufficient to show that a lower NOx emissions rate was consistently achievable by Pennsylvania sources. And the D.C. Circuit deferred to EPA on this exact technical point in Wisconsin versus EPA, a case cited in our brief. There the court upheld EPA's explanation that a source's very best rate is not necessarily a consistently achievable rate. And I'd also want to point out that in Pennsylvania's analysis of five years of historic emissions data, it set aside data from the four worst polluting sources and took the average of what remained. So when Sierra Club argued that Pennsylvania's limit is not sufficiently technically technology-forcing, one, that reveals an error of the law and of the record. Pennsylvania wasn't required to adopt the most stringent limit that any particular source was capable of achieving. See Wisconsin versus EPA. And on the record, Pennsylvania's limit, even in Sierra Club's view, is technology-forcing. That's because certain sources within the state would be required to modify their operations and upgrade their FCR systems in order to meet the more stringent limits that Pennsylvania adopted. I'm happy to take any further questions from the panel. Thank you. No, I have none. Thank you. Paul, you have a couple more. Go ahead. Did you have any questions? No, I have none. Oh, okay. I don't have a question. Thank you. Okay. Thank you very much. Okay. Excuse me. We'll hear from Mr. Walker. May it please the Court. My name is Jeffy Walker, and I represent Intervenor Pennsylvania Department of Environmental Protection. DEP has experienced regulating air pollution in Pennsylvania since 1960. This case is about DEP applying that expertise during a rulemaking to reduce pollution from coal-fired power plants. I want to make two points for the Court. The first point is that Pennsylvania's rule is consistent with the Clean Air Act, and the second point is that Pennsylvania's record-keeping requirements ensure compliance. The administrative record shows that Pennsylvania's pollution control limit represents reasonably available control technology for Pennsylvania. Could you start with the second point? Let me have two minutes. That's one of the concerns in the record-keeping. Maybe you can address that. Yes, Your Honor. The second point is that Pennsylvania's record-keeping and reporting requirements are legally enforceable. DEP established a 600-degree temperature threshold for operating pollution controls. The plain language of the rule requires units to record the inlet temperature data. Further, all units subject to the rule have permits, and all of these permits have record-keeping and reporting provisions. Are these temperatures routinely reported currently to the Pennsylvania Department of Environmental Protection? Your Honor, in practice, the Department does have some of the data. In practice, DEP inspectors go to the facility to do a full compliance inspection with the permit, and as part of that inspection, the inspector is asked to see the temperature inlet data at that time. Are they not available for citizen suits under FOIA? A citizen is able to come into the department to review the file and the records, and so if the department has the temperature data, citizens are able to review that. But you're going to have to look at all of the temperature data, and so sometimes it will be there and sometimes it won't. That's correct, Your Honor. And I would also note on that point that the operating permit condition actually includes a condition to further answer your question that if the department has records, they must be made available to the public. Okay, but that's the gift that your adversary, Mr. McClendon, is concerned about here. I'd like to hear a little more on the record because I'm still troubled by what makes it not technical, what the technical economic considerations on JA-12 are that make it infeasible. Mr. Atkins clarified that this wasn't just about ammonia slip, or it's not practically feasible to use SCRs below 600 degrees, but I'm not seeing the computations in the record that say here's why it's not economically feasible. You know, the curve you're, Mr. McClendon, pointed to, you can use these at 500 to 550 degrees. It's within the operating range. We're talking about an optimal range, not a hard and fast range. So is there more in the record we should look at to discover what these technical economic considerations are that make it impractical, if not technically infeasible, at least impractical, to require this level of reduction at some lower temperatures? Why do we need a temperature threshold or this temperature threshold? Thank you for the question, Your Honor. The Department made an engineering judgment evaluating the cost manual guidance, EPA's cost manual guidance, and the Department believes the record adequately supports its position in that. Where is the engineering judgment in the record? Where is the best explanation of that engineering judgment in the record? The best explanation is in response to on pages 58, 59, and 61, comments 58, 59, and 61 of the Department's comment response document. And do you have the JA site for that? I do not offhand, Your Honor, but I'm glad to find it for you. We'll look it up. Please go on. Okay. Yes, and so the distinction is, and I do want to address that to get into that. The Department, one distinction is that there are design limitations on this SCR technology that's employed, which the Department explains in those comments that I just referenced. This technology is designed for high base load, high capacity operation, and due to changing market conditions, it is operating in variable mode based on the need for electricity from the PJM market. So what that means is that these coal-fired power plants don't have the discretion to operate. They do not operate. The temperature is not arbitrarily determined by the power plants on a whim. As Sierra Club asserts, the temperature depends on how much coal is being burned. And this is clearly beyond the plant's control. They don't manipulate the market or the amount of coal burned. So that was brought up to address the loophole argument. And I want to also address the imodium bisulfate argument. Imodium bisulfate, given the design technology limitations I just described, imodium bisulfate is not readily reversible, as Sierra Club suggests. A plant would have to run at high base load, high capacity operation with that technology, but as I mentioned, because of market realities, they operate in variable mode. So this means that if they would run at a lower temperature, it would, basically, it would cause operational problems, fouling, heating. It would lead to unplanned shutdowns and increased maintenance. And that is in the record in the department's response to support that limit. If I may just very briefly get back to my... Well, unless you have other questions, that's probably the reason. To me, I can't figure out, you only have two minutes of time, and you have to go over it because you're responding to our questions. But if there's anything else, why don't you submit that in the 28-J letter, so we'll have the benefit of it. I'm sorry, I didn't hear the end of that, Your Honor. If you have anything else you wanted to bring to our attention, you can do that in the 28-J letter that you sent to us with copies to opposing counsel and look at the benefit of it that way. Okay, thank you. Thank you. Mr. McPherson, I think you've reserved some time. I'm not sure about that. Yes, Your Honor. Charlie McPherson and I have reserved three minutes. I'll just make a few quick points. Counsel pointed to the language in the final rule, JA011, 012, at the bottom of the third column and continuing on to the second. And I just want to make two points with reference to that. First, it confirms that there is an operating range of selected catalytic reduction below 600 degrees. And, in fact, at the very bottom of that third column on JA011, it confirms that EPA sees it as a glass-half-empty, we see it as a glass-half-full, but there's still 77% reduction at 600 degrees Fahrenheit. And this is consistent with that chart I pointed to that appears in both of the briefs of EPA and DGP. On the next page, I want to clarify, in case there's any doubt, that selected catalytic reduction is not in place of low NOx burners. Selected catalytic reduction is a post-combustion control. Low NOx burners are earlier in the training and the engineering sequence, so it's not a matter of substituting one for the other. In terms of one of the judges asked a question about operating SCR below 600 degrees being not infeasible but impractical, and I respect the question, but I would respectfully suggest that feasibility or infeasibility is the metric here under EPA's own construction and reasonably available control technology standards. And in terms of cost analysis for different temperatures, there is no record on that in this proceeding. EPA simply hasn't done that, so there's nothing for EPA to point to there. And last, there were some good questions about emission levels in other states. I'll just note that those comment letters are in the record starting around JA, I think it's 351 or 354, and I commend the court to the Maryland letter in particular, but also the New York letter for data about what other states are actually doing and how they are more stringent than Pennsylvania. With that, I'll just say we urge the court to apply the standard of Prometheus radio. EPA must examine the relevant data and articulate a satisfactory explanation for its actions, including a rational connection between the facts found and the choice made. We urge the court to find that EPA has acted arbitrarily and to remand this to EPA for further action. Okay, counsel, there's another question. Again, we'll thank all three of you, Denise, and we'll take the matter under advisement. And Greg can recess, and we'll call you a number. I was talking to this in about 10 minutes. Could I ask that we get a transcript of this one, too? Oh, absolutely, yes. Well, thanks for letting me. Please. Let's get a transcript of that and ask that we finance that in the U.S. Department of Environmental Protection and then the Pennsylvania Department of Environmental Protection.